Lena M. HARDEN, Plaintiff,

v.

**DAYTON HUMAN REHABILITATION CENTER, et al., Defendants.**

No. C–3–79–159.

United States District Court,
S. D. Ohio, W. D.

Aug. 6, 1981.

Bennie E. Espy, Columbus, Ohio, for plaintiff.

Thomas P. Randolph, Paul A. Folfas, Dayton, Ohio, for defendants.

OPINION ADOPTING REPORT AND RECOMMENDATION OF MAGISTRATE IN ITS ENTIRETY, WITH ONE NON–RELEVANT EXCEPTION; JUDGMENT ON ISSUE OF LIABILITY TO BE ENTERED IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANTS FOLLOWING ACTION ON MAGISTRATE'S REPORT AND RECOMMENDATION ON ISSUE OF DAMAGES

RICE, District Judge.

I. *Introduction*

This matter is before the Court pursuant to the Objections to the Magistrate's Report and Recommended Decision which have been filed by the Defendants, the Dayton Human Rehabilitation Center, the Department of Human Resources, and the City of Dayton (hereinafter referred to as Defendants) on August 22, 1980. In particular, Defendants have objected to Findings of Fact 14, 15 and 19, and to Conclusions of Law 5, 6 and 7. The Court will later discuss each contention raised by Defendants, but before undertaking that task, will briefly outline the scope of review which this Court possesses over the reports and recommended decisions of the Magistrate.

The Order of Reference in the present case, by Judge Rubin on April 30, 1979 (Doc. 3), constituted a reference to a special

master under 28 U.S.C. § 636(b)(2). § 636(b)(2) does not specify a standard to be applied when the district court reviews a reference made thereunder, but does emphasize that the Rules of Civil Procedure will be applied to special references made under that section. In *Oliver v. Allison*, 488 F.Supp. 885 (D.D.C.1980), the Court concluded that despite the silence of § 636(b) with respect to a review standard, Fed.R. of Civ.Pro. 53(e)(2) should govern the findings of a magistrate conducting civil trials, because he was acting "in several respects as a special master," *id.* at 888, and his findings, like those of a special master, should be entitled to deference. *Id.* Since § 636(b)(2) does clearly stress the applicability of the Rules of Civil Procedure, this Court also concludes that references under 28 U.S.C. § 636(b)(2) are to be subjected to the review standards established in Fed.R. of Civ.Pro. 53(e)(2).

 Rule 53(e)(2) provides that "in actions to be tried without a jury, the Court shall accept the master's findings of fact unless clearly erroneous." In determining the meaning of "clearly erroneous" where a reference to a master was involved, the Sixth Circuit Court of Appeals in *Agricultural Services Ass'n, Inc. v. Ferry-Morse Seed Co.*, 551 F.2d 1057 (6th Cir. 1977), utilized the following definition:

> A finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Id.* at 1071 [quoting from *United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)]. Therefore, in assessing the factual findings made by the Magistrate, the Court will apply the standard designated above. With respect to the Magistrate's legal conclusions, however, the Court will exercise its independent judgment. *Avco Corp. v. American Telephone and Telegraph Co.*, 68 F.R.D. 532, 534 (S.D. Ohio, 1975). With these standards in mind, the Court now turns to a consideration of the procedural background of this action, which will be followed by an analysis of the specific issues raised by Defendants.

## II. *Procedural History*

On April 5, 1979, Plaintiff Lena Harden commenced the within action against the Dayton Human Rehabilitation Center, alleging that the Defendant had discriminated against her because of her sex. Harden had been employed by the Defendant as a Rehabilitation Specialist I in the female quarters of the Rehabilitation Center, but was notified that her position would be abolished March 31, 1978, due to the fact that the female quarters in the Rehabilitation Center were being eliminated. Plaintiff also alleged that the Defendant did not allow her to transfer to the male quarters, and therefore committed an unlawful practice under 42 U.S.C. § 2000e–2(a)(1) and (2). On April 30, 1979, this matter was referred to the U.S. Magistrate, and on September 18, 1979, Plaintiff filed her Amended Complaint, naming the Dayton Human Rehabilitation Center, the City of Dayton, and the Department of Human Resources as parties defendant. A trial on the merits was held on January 28 and 29, 1980, before the U.S. Magistrate, who filed his Report and Recommendation on June 19, 1980. The Magistrate found that Plaintiff had established a prima facie case of discrimination by proving that Defendants had promulgated an occupational qualification prohibiting females from serving as Specialists in the male quarters of the Rehabilitation Center. The Magistrate further indicated that Defendants had failed to articulate legitimate, non-discriminatory reasons for adopting the bona fide occupational qualification (hereinafter bfoq). With regard to the Defendants' explanation that the bfoq was established to protect the male inmate's privacy, the Magistrate first concluded that the Defendants did not have standing in this action to raise the privacy rights of the Rehabilitation Center inmates. Assuming then that Defendants did have standing, the Magistrate further indicated that Defendants had failed to demonstrate: (1) that job responsibilities could not be arranged in such a way as to lessen the

clash between the privacy rights of inmates and the Plaintiff's equal employment interests; (2) that the bfoq was based upon administrative necessity rather than convenience; or (3) that they had a factual basis for believing that substantially all women would be unable to safely and efficiently discharge the duties of a rehabilitation specialist in the male quarters. Thus, the Magistrate recommended that judgment be entered for Plaintiff Lena Harden against Defendants, and additionally suggested that the case be continued for a determination by the Magistrate of an appropriate amount of damages.

On August 22, 1980, Defendants filed their Objections to the Magistrate's Report, and requested that his Recommendations be rejected. Plaintiff filed her Memorandum Contra on September 8, 1980, and on October 2, 1980, this matter came on for oral hearing before the Court. On February 23, 1981, the Court directed Defendants to file those portions of the transcript to which they had referred in their objections, and on February 27, 1981, Defendants complied with that Order, rendering the issues herein appropriate for resolution.

III. *Factual Findings*

A) *Finding of Fact No. 14*

In Finding of Fact No. 14, the Magistrate indicated that William Johnson, the Superintendent of the Rehabilitation Center, had testified that a female specialist could perform all of the duties required of a gate control officer, with the exception of strip searches, without creating any privacy problem for inmates. The Magistrate also found that Johnson had stated that if he had an adequate staff, he would be able to provide a full-time female position and still maintain the inmates' privacy. Since budgetary constraints prevented maintenance of a full staff, each specialist was required to perform the job functions of every other specialist. Defendants have objected to these findings as being selective, and have criticized as well the Magistrate's conclusion that staff shortages constituted the sole necessity for the Rehabilitation Center's requirement that each specialist perform all job functions, including strip searches.

An examination of the record has not indicated that the Magistrate was mistaken in his evaluation of Johnson's testimony. At various points, Johnson indicated that if his organization had a sufficient budget, he would be able to employ a female guard (T. 159,176,220), and that, omitting those occasions where a rehabilitation specialist would have to see a prisoner undressed, enough duties remained to constitute a full day's work (T. 175). The Court has found nothing in Johnson's testimony to contradict these statements, and accordingly concludes that Defendants' objections to Finding of Fact No. 14 are without merit.

· B) *Finding of Fact No. 15*

In Finding of Fact No. 15, the Magistrate found that David Stinson, Director of Personnel for the City of Dayton, had granted a bfoq on March 1, 1977, for the women's quarters at the Human Rehabilitation Center, which specified that only females would be hired for positions in the women's quarters. The Magistrate further found that this bfoq was in violation of Ohio Rev.Code Ann. § 4112.02(E)(5), and that no complaints had been made by male prisoners concerning invasions of their privacy. The Defendants have objected to these conclusions, based on the fact that while the Magistrate found the bfoq to be a violation of the Ohio Civil Rights law, he nonetheless refused to admit evidence of a contrary finding by the Ohio Civil Rights Commission, the agency responsible for investigating violations of those laws. In addition, Defendants have contended that the Magistrate ignored both the testimony of the legal director of the Ohio Civil Rights Commission, and the specifications of Ohio Rev. Code Ann. § 4112.02(E). Finally, Defendants have objected to the Magistrate's finding regarding the lack of male complaints of privacy invasions, as being contrary to the testimony of William Johnson.

The Magistrate did refuse to permit the introduction of Defendants' Exhibit C, which was identified as a document con-

taining the disposition of Plaintiff's complaint by the Ohio Civil Rights Commission (T. 311). The Magistrate based his rejection of Exhibit C upon the fact that the document was unenlightening because it contained only a recitation of the bfoq, and a conclusion, without supporting reasoning, that the matter should not be continued (T. 313). Defense counsel urged admission of Exhibit C as relevant evidence of the validity of Defendants' bfoq, apparently because: (1) the Ohio Civil Rights Commission had previously approved a bfoq similar to that herein, for use in the Ohio State Correctional institutions; (2) the Ohio Civil Rights Commission investigation culminating in Exhibit C had been based on the same charges and same bfoq at issue in the present lawsuit; and (3) based on these identical charges, and presumably, the bfoq previously approved for the state correctional institutions, the Ohio Civil Rights Commission had recommended that the case before it be dismissed (T. 311–312). The Magistrate declined admission, for the reasons given above. He also stated that he was unaware of any federal court which had admitted the results of a state civil rights commission investigation (T. 313).

The Sixth Circuit has indicated that the admission of E.E.O. final investigation reports is within the sound discretion of a judge. *Heard v. Muller Co.*, 464 F.2d 190, 194 (6th Cir. 1972). In that case, the Court further commented that such reports would not be *per se* admissible, but would be appropriate for consideration if relevant to the controversy before the Court. *Id.* at 194. Although the report of the Ohio Civil Rights Commission was arguably relevant to the matters under consideration, the Court does not feel that the Magistrate committed error by denying admission. First, to the extent that admission was urged as proof of the validity of the Defendants' bfoq, the Court fails to comprehend how a conclusion reached by an administrative agency can render the validity of a bfoq, or the existence or non-existence of discrimination, either more or less probable. Rather, an assessment of these issues will depend upon the facts of a particular

case, not upon an agency's conclusions regarding those facts. Second, even if the report had been relevant for some other reason, the matters contained therein were testified to at trial (T. 248, 249, 273), so that admission would merely have been cumulative of evidence already adduced. As an additional matter, the Exhibit dealing with the state correctional institution bfoq was admitted (T. 66), and sufficient testimony was received with regard to that item, to enable the Magistrate to make an informed comparison of the bfoqs (T. 56, 57).

While the Court agrees with the Magistrate to the extent indicated above, the Magistrate was not correct in his apparent blanket refusal to consider admitting any findings of a state civil rights commission, no matter how relevant (T. 313). Although no Supreme Court case has been found specifically addressing the precise question herein, rulings have been made on related matters. For example, in *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Supreme Court considered whether a litigant would be precluded from maintaining an action under Title VII if he had previously participated in arbitration proceedings. The Court indicated that a party should not be required to elect remedies, and further stated that the prior arbitral decision might be admitted into evidence and given such weight as the court deemed proper. *Id.* at 60, 94 S.Ct. at 1025. Then, in *Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976), the Court, in ruling that federal employees should be given a trial de novo in federal court, stated that "[p]rior administrative findings made with respect to an employment discrimination claim, may of course, be admitted as evidence at a federal sector trial de novo." *Id.* at 863, 96 S.Ct. at 1960.

In view of these Supreme Court rulings, this Court sees no precedent which would prevent admission of state agency findings if those findings are deemed relevant to the matter under consideration. Moreover, the Court does not find any

meaningful distinction which can be drawn between arbitral decisions and E.E.O.C. reports on one hand, and state civil rights commission reports on the other, particularly when both the E.E.O.C. and Ohio Civil Rights Commission are charged by law with the performance of similar duties. *Compare* Ohio Rev.Code Ann. § 4112.04 with 42 U.S.C. § 2000e–4 (1970). Thus, the Court concludes that findings of the Ohio Civil Rights Commission shall be admitted on the same basis as E.E.O.C. reports and arbitral decisions, and shall be entitled to such weight as is deemed appropriate. *Alexander v. Gardner-Denver Co.*, 415 U.S. at 60, 94 S.Ct. at 1025.

■ After an analysis of Ohio Rev.Code Ann. § 4112.02(E)(5), the Court must agree with the Magistrate's finding that the bfoq, established on March 1, 1977 for the female quarters of the Rehabilitation Center, constituted a violation of that section of the Ohio Civil Rights law. Defendants have contended that no violation existed under § 4112.02(E)(5) because the requirement therein of an advance bfoq certification by the Ohio Civil Rights Commission is limited to pre-employment settings. While this interpretation of the statute is correct, the 1977 bfoq established for the women's quarters of the Rehabilitation Center, indicated that "all positions and duties at this facility, *will be* governed and filled by females" (Magistrate's Recommended Decision, p. 5) (emphasis added). This bfoq did operate in a pre-employment situation, by virtue of that fact that all *prospective* male applicants would have been excluded from employment in the women's quarters, solely because of their sex (emphasis added). Since this bfoq was not certified in advance, as required by law, the Magistrate was correct in concluding that the Defendants' 1977 bfoq violated § 4112.02(E)(5). Defendants' objections to this conclusion therefore, are without merit.

Defendants' final objection to Finding of Fact No. 15 is, as noted, that the Magistrate ignored the testimony of William Johnson that male inmates complained about the prospect of being guarded by females. The testimony of Johnson indicates, however, that the complaints by male inmates were not received until 1978, when the female quarters were being abolished (T. 42, 43). Thus, when the bfoq for the female quarters was established in 1977, no complaints had been received from male inmates. An examination of Finding 15 indicates that all of the statements contained therein are related to the 1977 bfoq. Moreover, the Magistrate's conclusion regarding male inmate complaints is clearly connected to, and furnishes the basis for, the Magistrate's immediately preceding statement that no consideration was given to segregation of the male quarters when the female bfoq was issued in 1977. Thus, although the Magistrate failed to repeat the date "1977" in the last sentence of Finding 15, his conclusion of no complaints is clearly intended to relate to 1977 rather than 1978. Thus, Defendants' objection to this portion of Finding Fifteen is also without merit.

Based on the preceding analysis, the Court concludes that the Magistrate did not err: (1) in refusing to admit Exhibit C; (2) by concluding that Ohio Rev.Code Ann. § 4112.02 had been violated by Defendants' 1977 issuance of a bfoq for the female quarters of the Rehabilitation Center; or, (3) in finding that no male inmate complaints about privacy had been made. Therefore, Defendants' objections to Finding of Fact No. 15 are without merit, and are overruled.

*C) Finding of Fact No. 19*

In Defendants' objections to the Report of the Magistrate, specific objection was made to Finding of Fact No. 19, but no mention of that finding has been made in the memorandum accompanying Defendants' objections. The Court has reviewed Finding of Fact No. 19, and has concluded that the Referee's findings therein were not clearly erroneous as the evidence does indicate that in February, 1978, Plaintiff did have more seniority than some male specialists (T. 136), and that she would have accepted a male specialist position if she had been permitted to do so by Defendants (T. 135, 141). Thus, Defendants' objections to

Finding of Fact No. 19 are not well taken, and are overruled.

### D) Finding of Fact No. 21

Because Defendants have referred to Finding of Fact No. 21 in their memorandum, the Court will include that finding in its discussion. In Finding 21, the Magistrate indicated that the bfoq for the male quarters was established on February 15, 1978, in violation of Ohio Rev.Code § 4112.-02(E)(5). The Magistrate further found that as no complaints about potential privacy violations had been made by male prisoners, the only purpose of the bfoq was to prevent female specialists from assuming the positions to which they had been informed they were entitled. Although Defendants have raised several legal issues which will be addressed later in this Opinion, the sole factual objection to Finding 21 appears to involve the Magistrate's conclusion that the male prisoners had made no complaints regarding anticipated privacy violations. Johnson, the Superintendent for the Rehabilitation Center, did testify that male inmates had complained to him and to their supervisors regarding the possibility of being searched by females (T. 42, 90). However, Johnson also indicated that he did not bring these complaints to the attention of anyone in the City Government (T. 42, 43). Moreover, the testimony of Stinson, the Personnel Director for the City of Dayton and the official responsible for establishing the bfoq, reveals that he did not premise the bfoq on specific complaints from male inmates, but based its issuance on his personal observation that the physical layout of the Rehabilitation Center would enable female guards to view male inmates who were disrobing (T. 323).

While the Magistrate could have phrased Finding 21 with more clarity, an examination of that Finding and the discussion on page twelve of the Recommended Decision indicates that the conclusion of "no complaints" was intended to relate to Stinson's lack of knowledge of male inmate complaints. On page twelve of his decision, the Magistrate stated that there "was no evidence of any facts brought to the attention of the Director of Personnel which would lead him to believe that such a bfoq was required to protect inmate privacy," and also noted that Stinson had issued the bfoq without consulting the Superintendent of the Rehabilitation Center. Since these statements clarify Finding 21 by relating the lack of complaints, or lack of knowledge of complaints, to the person responsible for promulgating the bfoq, the Court does not have a firm conviction that the Magistrate has committed a mistake. Further, to the extent that Finding 21 indicates that the bfoq for the male quarters was established on the basis of *speculation* about potential privacy violations, that conclusion is amply supported by the evidence in the record. That there would be no testimony indicating that any actual incidents of privacy invasions had occurred, is hardly surprising, since the Rehabilitation Center did not attempt, even on an experimental basis, to employ female guards in the male quarters. Thus, since Finding 21 is not clearly erroneous, Defendants' Objections to that finding are overruled.

### IV. Conclusions of Law

### A) Conclusions of Law No. 5 and No. 7

In Conclusion of Law No. 5, the Magistrate found that Defendants had failed to articulate legitimate, non-discriminatory reasons for establishing the bfoq prohibiting females from serving as rehabilitation specialists in the male quarters of the Dayton Human Rehabilitation Center. The Magistrate further indicated in Conclusion of Law No. 7, that Defendants had failed to demonstrate: (1) that they had a factual basis for believing that substantially all women would be unable to safely and efficiently perform the duties involved; (2) that they could not rearrange job responsibilities in a way to minimize the clash between privacy interests and Plaintiff's equal employment opportunities; or (3) that the bfoq was based on administrative necessity rather than convenience. Defendants have objected to these conclusions by arguing that they acted out of legitimate concern for the privacy of inmates, and that

because the toilet and shower facilities in the Center are open to view, job responsibilities cannot be altered to allow employment of women. Defendants further contend that even if responsibilities could be redistributed to allow employment of a female, the resulting job would represent a mere token position because her only permissible duties would be the opening and closing of the front gate to the male quarters.

Before addressing the specific matters raised by Defendants, the Court will outline the standards necessary for evaluation of the validity of a bfoq defense. After these general criteria have been discussed, the Court will then apply the appropriate legal standards to the bfoq at issue in this case. 42 U.S.C. § 2000e–2(e)(1970) provides that:

Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees . . . on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.

The Sixth Circuit has not spoken with regard to the standards applicable where a bfoq defense is raised in response to a concededly discriminatory act, although as seen below, they have indicated that assertion of a bfoq by an employer is an affirmative defense. The Fifth Circuit, however, has formulated certain standards to be used in assessing the validity of a bfoq. First in *Weeks v. Southern Bell Telephone & Telegraph Co.*, 408 F.2d 228 (5th Cir. 1969) (Weeks), the Court indicated that:

[I]n order to rely on the bona fide occupational qualification exception, an employer has the burden of proving that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved.

*Id.* at 235. Then, in *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385 (5th Cir. 1971) (Diaz), the Fifth Circuit added further language to the effect that:

[T]he use of the word "necessary" in section 703(e) requires that we apply a business *necessity* test, not a business *convenience* test. That is to say, discrimination based on sex is valid only when the *essence* of the business operation would be undermined by not hiring members of one sex exclusively.

*Id.* at 388 (Emphasis supplied in original). In *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224 (5th Cir. 1976) (Tamiami) the Fifth Circuit combined the above two tests, and added another refinement which was characterized as having been implicit in *Weeks*. *Id.* at 228, n.5. The final formulation of the *Weeks-Diaz* test, which was approved in *Tamiami*, is that the burden is on the employer to illustrate: (1) that the bfoq is reasonably necessary to the essence of his business, and (2) that the employer has reasonable cause, that is, a factual basis, for believing that all or substantially all persons within the class (herein, women) would be unable to perform safely and efficiently the duties of the job involved, or that it is impossible or impractical to deal with the class members on an individualized basis. *Id.* at 236.

The above formulation has been followed by other courts, *Arritt v. Griswell*, 567 F.2d 1267, 1271 (4th Cir. 1977), and the language used in *Weeks* and *Diaz* was cited with approval by the Supreme Court in *Dothard v. Rawlinson*, 433 U.S. 321, 333, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977) (Dothard), where the Court also indicated that "the bfoq exception was in fact meant to be an extremely narrow exception to the general prohibition of discrimination on the basis of sex." *Id.* at 334, 97 S.Ct. at 2729. Thus, this Court concludes that the formula outlined in *Tamiami* is an appropriate and effective method of assessing the validity of an occupational qualification asserted as a defense to charges of Title VII discrimination.

Before addressing the bfoq in question herein, however, a few other comments are in order. This Court is aware of the recent Supreme Court decision in *Texas Dept. of*

*Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (Burdine), wherein the Court ruled that the defendant's burden in meeting a prima facie case of discrimination under Title VII, was not to prove by a preponderance of the evidence that the employment decision was based upon non-discriminatory reasons, but rather was only that of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* 101 S.Ct. at 1096. Although this burden is distinctly less than that placed upon the defendant by *Tamiami*, there are several reasons why the *Burdine* standard does not apply to cases involving a bfoq defense. First, the usual Title VII order and allocation of proof, as outlined in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (McDonnell-Douglas), is not appropriate for application to cases in which charges of discrimination are premised upon a defendant's issuance of an alleged bfoq. In *McDonnell-Douglas*, the Supreme Court indicated that in Title VII cases, the plaintiff would be required to establish a prima facie case of discrimination, *id.* at 802, 93 S.Ct. at 1824 (with the elements of the prima facie case being adjusted to fit varying factual patterns *id.* at 802, n.13, 93 S.Ct. at 1824, n.13), after which time the defendant would have the burden of articulating a legitimate, non-discriminatory reason for the discriminatory act. *Id.* at 802, 93 S.Ct. at 1824. After this showing by the defendant, the plaintiff must then be afforded an opportunity to illustrate that the employer's stated reason was in fact a pretext. *Id.* at 804, 93 S.Ct. 1825. The *McDonnell-Douglas* formula has been followed widely in Title VII cases, but the Supreme Court has emphasized that the allocation of proof outlined in *McDonnell-Douglas* was not intended to be an "inflexible formulation", *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977) (Teamsters), or to be "rigid, mechanized or ritualistic". *Furnco Construction Co. v. Waters*, 438 U.S. 567, 577, 98 S.Ct.

2943, 2949, 57 L.Ed.2d 957 (1978) (Furnco). In *Furnco*, the Court provided the following rationale for the *McDonnell-Douglas* inquiry:

> [I]t is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. A prima facie case under *McDonnell-Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors . . . and we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting.

*Id.* 438 U.S. at 577, 98 S.Ct. at 2949–50 (citation omitted). In *Burdine*, the Supreme Court further clarified the function of the prima facie case, by stating that it "eliminates the most common non-discriminatory reasons for the plaintiff's rejection." *Burdine*, —— U.S. ——, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

■ The necessity for the *McDonnell-Douglas* allocation of proof, and in particular the prima facie case with its resulting inferences, is absent in situations involving a bfoq. Where, as herein, an employer has issued an occupational qualification which distinguishes between persons due to sex, he is concededly discriminating on a basis made impermissible under Title VII. Thus, there is no need for the plaintiff to establish a prima facie case in order to eliminate the most common non-discriminatory reasons for the employer's action, or to create an inference that the action was more likely than not based on consideration of impermissible factors. Clearly, the promulgation of a bfoq is an impermissible act of "overt discrimination", *Dothard*, 433 U.S. 321, 332, 97 S.Ct. 2720, 2728, 53 L.Ed.2d 786 (1977), and the employer must consequently bear the burden of establishing that his otherwise unlawful classification falls within 42 U.S.C. § 2000e–2(e)'s "extremely narrow exception to the general prohibition of dis-

crimination on the basis of sex." *Id.* at 334, 97 S.Ct. at 2729. Since the assertion of a bfoq is in the nature of an affirmative defense, *Roberts v. Union Co.*, 487 F.2d 387, 389 (6th Cir. 1973); *Laugesen v. Anaconda Co.*, 510 F.2d 307, 313 (6th Cir. 1975), the employer must then prove, by a preponderance of the evidence, that the occupational qualification is bona fide under 42 U.S.C. § 2000e–2(e).

The Court has felt constrained to engage in the above analysis for the purpose of distinguishing *Burdine*, and in order to clarify for the future, what standards will be applied by this Court in assessing the validity of occupational qualifications which are premised upon distinctions prohibited by Title VII. The impact of these conclusions upon the present matter is not significant, however, for the Court has concluded that Defendants have failed to comply with even the minimal burden of production imposed by *Burdine*. Moreover, the Magistrate did correctly assess the bfoq in question in pages ten, eleven and twelve of his decision and on page fourteen of his decision, when he concluded that Defendants had failed to establish: (a) that they could not reasonably rearrange job responsibilities in a way to minimize the clash between privacy interests of the inmates and the equal employment rights of Plaintiff; (b) that the bfoq was based upon administrative necessity rather than mere administrative inconvenience, and (c) that they had a factual basis for believing that substantially all women would be unable to safely and efficiently perform the duties of the job involved.

Applying *Tamiami* to the facts of the present case, the Court finds that the essence of Defendants' business involves the operation of a medium security Rehabilitation Center, which is designed to assist in the rehabilitation of persons who have been convicted primarily of misdemeanor crimes (T. 6, 7, 8, 36). The essence of the job of a Rehabilitation Specialist requires, *inter alia*: monitoring inmate traffic inside the institution and on trips outside the institution; protecting inmates and government property by being watchful for fights, fires, and the smuggling of contraband; passing out clothing and other articles to the inmates; conducting strip searches; and patrolling the dormitories (T. 167, 168, 169, 170, 172).

Defendants have conceded that they do not claim "that women cannot safely and efficiently perform the duties of the job involved" (T. 44, Memorandum in Support of Defendants Objections to the Magistrate's Report, p. 12). Thus, without question, Defendants have failed to prove the validity of the bfoq herein under that portion of *Tamiami* which relates to safe or efficient performance of job duties. An issue still remains, however, with respect to the second portion of *Tamiami*, that is, whether the bfoq is reasonably related to the essence of the business or the job, and the employer has a factual basis for believing that it is impossible to deal with women on an individualized basis. *Tamiami*, 531 F.2d 224, 236 (5th Cir. 1976).

By premising the bfoq herein on the privacy concerns of inmates, and a fear of inmate violence should women be hired (T. 191), the Defendants have clearly attempted to illustrate that the restriction of specialist jobs to males is related to the maintenance of order within the institution, and that based on complaints and anticipated violence, Defendants had a basis in fact for believing that they could not deal with women on an individualized basis. Although disruption of the prison system is certainly a legitimate concern, *Gunther v. Iowa State men's Reformatory*, 612 F.2d 1079, 1086 (8th Cir. 1980) (Gunther), the Court does not find, *on the evidence presented*, that Defendants had a factual basis for believing that such violence would occur. The evidence of record indicates that there had been frequent occasions when male inmates had been exposed to female guards, without any disruption of normal activity. In particular, Nora Franklin, a former rehabilitation supervisor for the women's quarters, testified that for over a year, she supervised as many as fourteen male residents in a laundry area (T. 77, 78). During this time, she was locked in the laundry with the male in-

mates, and was able to communicate with the outside, or call for help, only by using the telephone (T. 85, 86). Despite this isolated position, Franklin testified to only one problem, which occurred when a mentally defective patient became violent (T. 85). In fact, on this occasion, the other male inmates assisted Franklin in subduing the violent inmate (T. 85). Other than this incident, the record is devoid of any mention of incidents which occurred during contact between female guards and male prisoners.

Moreover, the factual basis for the bfoq could not have been premised on male inmates' complaints about possible strip searches by females, or other potential privacy violations, because, as previously noted, the record indicates that none of the inmate complaints were communicated to Stinson (T. 42, 43). Since Stinson, as Director of Personnel for the City of Dayton, was the person responsible for issuing the bfoq for the male quarters, complaints about privacy violations could not, in fact, have provided the basis for his issuance of the bfoq. Although Stinson's issuance of the bfoq apparently resulted from his visit to the male quarters, and his observation that male inmates could be seen disrobing by female guards (T. 323), the Court is unconvinced that *speculation* about potential privacy violations creates a basis in fact for the issuance of an occupational qualification such as the one herein. Cf. *Forts v. Ward*, 566 F.2d 849, 854 n.18 (2nd Cir. 1977) (noting that a distinction exists between allegations of *actual* invasions of privacy and the *possibility* of such an invasion) (emphasis added).

However, assuming that the possibility of potential privacy invasions constituted a proper factual basis for Defendants' belief that the bfoq was required, that fact did not justify the Defendants' failure to treat women on an individualized basis, under the pertinent case law dealing with bfoqs in the context of privacy rights. In determining whether a rest home had correctly established a bfoq based on the privacy interests of its guests, the court in *Fesel v. Masonic Home of Delaware, Inc.*, 447 F.Supp. 1346

(D.Del.1978) (Fesel) noted that cases involving an employer's perception of privacy rights involved different considerations than did cases where the bfoq was related to the employer's perception of the physical ability of one sex to perform required job responsibilities. *Id.* at 1350. Concluding that a slightly varied approach was needed for assessment of privacy concerns, the Court held that:

> [W]hen an employer defends a sex discrimination action by raising the privacy interests of its customers as the basis for a bfoq defense, that employer must prove not only that it had a factual basis for believing that the hiring of any members of one sex would directly undermine the essence of the job involved or the employer's business, but also that it could not assign job responsibilities in such a way that there would be minimal clash between the privacy interests of customers and the non-discriminatory principle of Title VII.

*Id.* at 1351.

In the present case, the Court has concluded, after a review of the evidence, that Defendants have failed to produce evidence, or to establish, either that the hiring of women guards would undermine the essence of the job involved, or that job responsibilities could not be assigned in order to minimize the anticipated conflicts. First, the Court notes that the only duties which would be absolutely prohibited to women guards would be: (1) the performance of strip searches, which are conducted when an inmate enters the institution for the first time (T. 25), and after inmates return from work details (T. 173); and (2) the observation of inmates while they are taking showers (T. 189). Given the plethora of rehabilitation specialist duties outlined at trial (T. 165–175), the Court is unable to find that the exception of these two tasks from the female rehabilitation specialist position would undermine the essence of that job, particularly when it appears that women have been employed effectively as a matter of course even in maximum security institutions. *Dothard*, 433 U.S. 321, 336 n.

23, 97 S.Ct. 2720, 2730 n. 23, 53 L.Ed.2d 786 (1977). In fact, the testimony of Johnson indicates that there are sufficient duties even under the current situation to provide full-time work for female officers (T. 176).

Although Johnson indicated that staff shortages and budgetary constraints require each specialist to perform all job functions (T. 176), the Court does not find that these concerns would prevent the employment of female guards. As already indicated, the restriction of the female specialist jobs in the manner discussed would not be substantial and should not entail the hiring of additional personnel. Defendants have expressed concern that female guards could be accommodated only by restricting the female guard to the front control room where she would be unable to view the showers or individual dormitories (T. 220, 226), and have stressed that the resulting job would be substantially less difficult than the jobs of the other rehabilitation specialists (T. 225, 226). However, the Court does not believe that Defendants are required to constrict employment opportunities in so severe a manner in order to protect the privacy interests of male inmates.

First, the Court would emphasize the Supreme Court's statement in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) that "simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations." *Id.* at 545, 99 S.Ct. at 1877. While privacy rights may in some situations take precedence over the provision of equal job opportunities, *Forts v. Ward*, 471 F.Supp. 1095 (S.D.N.Y.1979), vacated in part on other grounds, 621 F.2d 1210 (2nd Cir. 1980) (Forts), it is possible to reconcile both of these interests. Because the Court is aware of the Defendants' concern over the specter of further litigation arising from the employment of female guards in the male quarters of the Rehabilitation Center, the Court would direct Defendants' attention to the district and appellate court decisions in *Forts*, which contain detailed suggestions for minimizing privacy violations while maximizing equal employment.

For example, the district court in *Forts* ruled that male guards could be employed on the two daytime shifts at the institution, and that privacy interests could be accommodated by permitting the female inmates to cover their windows for up to fifteen minutes at a time while clothes were being changed, or the toilet facilities were being used. 471 F.Supp. at 1100. The Court did not permit the employment of male guards while the prisoners were sleeping because of the possibility that a female's body might unknowingly be revealed during the night. *Id.* at 1101. The Court further ruled that some type of smoked glass should be installed in the showers so that the guards would be prevented from identifying specific residents, but would be able to perform their duty of assuring themselves of an inmate's prompt and timely departure from the shower. *Id.* Although the shower facilities in *Forts* had a partial door, unlike those involved herein, the Court does not view the installation of a few shower doors to be an unwarranted burden on Defendants, particularly when that minor expense is balanced against the Title VII mandate of equal employment opportunity. On appeal, the Second Circuit in *Forts* affirmed the lower decision in part, but vacated that portion of the decision which had denied employment of male guards during the night shift. 621 F.2d at 1217. The Court found that appropriate sleepwear, to be provided by the State, would adequately protect the inmates' right to be protected against involuntary exposure of private parts of their bodies. *Id.*

While the Court does not today mandate what accommodations might be made by the Defendants to reconcile the competing interests of privacy and equal employment opportunities (and could not, in any event, as that issue is not before the Court), the preceding discussion has indicated that such an accommodation is entirely feasible and would not appear to impose an intolerable burden on an employer. Moreover, given these type of modifications, the employer would be able to offer a female, or male

applicant (as the situation might be) an opportunity for more than a token position.

Because Defendants adopted the bfoq for the male quarters of the Rehabilitation Center without *any* attempt to arrange job responsibilities to minimize the conflict between privacy interests and equal employment opportunities, they have failed, even under *Burdine*, to produce evidence which would allow this Court rationally to conclude that the bfoq was not motivated by discriminatory animus. Thus, despite the Magistrate's erroneous application of the *McDonnell-Douglas* order and allocation of proof, Conclusion of Law No. 5 will be accepted by the Court as a correct conclusion under the facts of this particular case. Moreover, since the evidence indicates that Defendants did not have a factual basis for: (1) concluding that hiring women would undermine the essence either of the rehabilitation specialist position, or the Defendants' business of rehabilitating prisoners, or (2) for believing that job responsibilities could not be rearranged, the Court finds that Defendants have not sustained their burden of proving that the alleged bfoq was reasonably necessary to the operation of the Dayton Human Rehabilitation Center. As the Magistrate's Conclusion of Law No. 7 adequately reflects these determinations, the Court adopts that conclusion in its entirety, and overrules Defendants' objections thereto as being without merit.

### B) Conclusion of Law No. 6

In Conclusion of Law No. 6, the Magistrate indicated that the Defendants did not have standing to raise the right of privacy of inmates as a basis for their bfoq. In his opinion, the Magistrate indicated that although no federal court had directly ruled on this question, the Defendant would, under *Dothard*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), and *Gunther v. Iowa State Men's Reformatory*, 462 F.Supp. 952 (N.D.Iowa 1979) be permitted "to rely on prisoner privacy rights only insofar as they relate to the difficulty of maintaining order or any other legitimate purpose of the penal institution." (Magistrate's Report, p. 9).

In the alternative, the Magistrate concluded in Conclusion of Law No. 7 that even if Defendants did have standing to raise the issue of privacy, they had not established the legitimacy of the bfoq in question. The Defendants have objected to Conclusion of Law No. 6 by arguing that they are required to protect the constitutional rights of the inmates of the Rehabilitation Center, and would be subject to liability if they did not observe this duty. Further, Defendants contend that since the prisoners are not parties to the present suit, principles of res judicata could not be applied to prevent a future action based on the violations of the inmates' privacy rights which will inevitably flow from the use of female guards. These considerations, as well as that of judicial economy, are urged by Defendants as compelling reasons why they should be permitted standing to assert the privacy rights of the Rehabilitation Center inmates.

However, the Court finds that both the Magistrate and Defendants have premised their conclusions upon an erroneous characterization of precisely what matters are presently before the Court. The sole issue under consideration, as was previously emphasized, is whether the bfoq established by Defendants for the male quarters of the Dayton Rehabilitation Center constituted a distinction between sexes made permissible under 42 U.S.C. § 2000e–2(e). To the extent that evaluation of the validity of Defendants' bfoq defense has necessitated the general consideration of privacy rights, the Court has done so, but has carefully refrained from indicating either the precise extent of the privacy interests herein, or in what manner those interests might be invaded by the hiring of female guards. The question is not whether privacy rights exist, or whether hiring of guards of the opposite sex would infringe upon those rights, but rather, assuming the existence of those factors, can the Defendants establish that they had a factual basis for believing: (1) that hiring guards would directly undermine the essence of the job involved, and (2) that they could not assign job responsibilities in such a way as to minimize the clash between privacy interests and equal employ-

ment rights. *Fesel*, 447 F.Supp. 1346, 1351 (D.Del.1978). If the Defendants cannot satisfy this burden, then the bfoq must be held not to be a bona fide occupational qualification under Title VII. Thus, the issue of the existence or extent of privacy rights is not, and has never been under consideration by this Court.

More importantly, even had privacy issues been directly raised herein, the Court would have declined to rule upon those matters, because no privacy violations have yet occurred at the Dayton Human Rehabilitation Center. While the Defendants' desire to avoid a multiplicity of lawsuits is understandable, the Court must adhere to established concepts of justiciability, which prohibit the determination of issues not having "sufficient immediacy and reality" *O'Shea v. Littleton*, 414 U.S. 488, 497, 94 S.Ct. 669, 677, 38 L.Ed.2d 674 (1974) [citing *Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969)] to merit the invocation of the Court's jurisdiction. Additionally, as a practical matter, the Court sees no reason why the Defendants cannot avoid future litigation by instituting protective measures similar to those outlined in the *Forts* case.

Because the Magistrate incorrectly assessed the relationship between privacy rights and the matter at issue in the present case, the Court must reject Conclusion of Law No. 6 and that portion of the Magistrate's Report which deals with standing. However, since the Magistrate did assume standing in his discussion of Conclusion of Law No. 7, and as the findings therein are essentially correct, the rejection of Conclusion of Law No. 6 does not have any effect upon the Court's previous determination regarding the sufficiency of the Magistrate's Recommendations.

### V. *Miscellaneous Concerns*

In Part III of Defendants' Memorandum in Support of Their Objections to the Magistrate's Report, Defendants have requested that additional evidence be taken in this action, in connection with their claim that Plaintiff is totally disabled and is thus not able to perform the duties of a rehabilitation specialist. To support this conten-

tion, Defendants have submitted certain unauthenticated documents, containing hearsay statements to the effect that Plaintiff has been disabled during a period of time from June 23, 1978 to July 13, 1979, and has obtained some recovery from Worker's Compensation for her injuries. The Court notes first that these documents have not been authenticated under the Federal Rules of Evidence, and have not been shown to be proper for consideration despite their hearsay nature, under Fed.R.Evid. 803 or 804. Ignoring these deficiencies, however, the matters cited by Defendants would be relevant not to the finding of intentional discrimination on the part of Defendants, but rather to the issue of what remedies may properly be afforded to Plaintiff. As the issue of damages has been specifically reserved for a further hearing by the Magistrate, Defendants will be afforded an opportunity to present evidence regarding Plaintiff's inability to perform the duties of a rehabilitation specialist, particularly insofar as reinstatement to that position may be involved. Therefore, the Court would direct the Magistrate to receive whatever evidence may be appropriate regarding the issue of Plaintiff's alleged disability, and to consider those matters in determining the nature and extent of the remedies to which Plaintiff may be entitled.

### VI. *Conclusion*

Based on the foregoing analysis, the Court finds that:

1. Defendants' Objections to Findings of Fact Fourteen, Fifteen, Nineteen, and Twenty-One (14, 15, 19, and 21), are not well-taken, and are overruled;

2. Defendants' Objections to Conclusions of Law Five and Seven (5 and 7) are not well-taken and are overruled;

3. Conclusion of Law Six (6), and pages eight and nine (8 and 9) of the Magistrate's Recommended Decision, insofar as they relate to standing, are rejected as unnecessary for resolution of the within case;

4. The Magistrate's Report is adopted in its entirety, with the exception of Conclu-

sion of Law Six and pages eight and nine of the Magistrate's Decision.

The captioned cause is ordered returned to the United States Magistrate for determination of the extent, if any, to which the Plaintiff may be entitled to damages as a result of the Defendants' acts of discrimination. The entry of judgment on the issue of liability will await the resolution on the damages issue.