**Robert D. EDWARDS, Plaintiff,**

v.

**DEPARTMENT OF CORRECTIONS, et al., Defendants.**

Civ. A. No. 84–T–975–N.

United States District Court, M.D. Alabama, N.D.

July 25, 1985.

Julian McPhillips, McPhillips & DeBardelaben, Montgomery, Ala., for plaintiff.

Harry A. Lyles, Bobby N. Bright, Asst. Atty. Gen., Asst. Gen. Counsel, Dept. of Corrections, Montgomery, Ala., for defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff Robert D. Edwards has brought this lawsuit charging that defendants Department of Corrections of the State of Alabama and various officials of the Department refused to promote him to a position in the state prison for women because he is a male.[1] Based on the evidence presented at a nonjury trial, the court concludes that Edwards has been a victim of illegal sex discrimination and is entitled to appropriate relief.

### I.

The facts in this case are simple and straight-forward. Between September 1982 and April 1983 and again between June and August 1983, the Department of Corrections appointed Edwards acting shift commander at Julia Tutwiler Prison for Women, Alabama's principal prison for women, with inmates from minimum to maximum security designations, located in Elmore County, Alabama. Although the position carries the rank of correctional officer supervisor I, the Department continued Edwards in his lower rank of correctional officer II.

In the summer of 1983, two shift commander positions became available at Tutwiler, including the one Edwards held on an acting basis. Edwards asked the Tutwiler warden to consider promoting him to one of the positions. The warden told Edwards that he could not be promoted because departmental policy restricted the positions to women. By a memo dated July 27, 1983, Edwards was reassigned from

---

1. Edwards has dismissed his claims under 42 U.S.C.A. §§ 1983 and 1985, leaving only his claim under 42 U.S.C.A. §§ 2000e to 2000e–17. Since this claim may be brought against the Department officials only in their official capac-

ities, *Clanton v. Orleans Parish School Board,* 649 F.2d 1084, 1099 n. 19 (5th Cir.1981) (Unit A), the court considers the Department and its officials as one entity and refers to them as the Department throughout this opinion.

acting shift commander to supervisor of transfer agents "as per orders of [the Department's Regional Coordinator for Central Alabama] that no males would serve in the capacity of shift supervisor. . . ."

However, only one of the two shift commander positions was immediately filled because only one qualified woman applied. The second position was not filled with a woman until the winter of 1983.

Edwards filed a timely charge with the United States Equal Employment Opportunity Commission; and, after receiving a notice of right-to-sue from the Commission, he timely filed this lawsuit charging that in the summer of 1983 he was denied a shift commander position because of his sex, in violation of federal law.

## II.

Edwards rests his claim of sex discrimination on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000e to 2000e–17. He charges the Department with intentional "disparate treatment" based on sex, in violation of the Act.[2]

■ A plaintiff may establish a claim of impermissible intentional disparate treatment under Title VII by either circumstantial or direct evidence. If the evidence is circumstantial, a trial court should consider the claim generally in the manner outlined

in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[3] If the evidence is direct, however, the trial court should approach the evidence generally in the manner outlined in such cases as *Thompkins v. Morris Brown College*, 752 F.2d 558 (11th Cir.1985) and *Hayes v. Shelby Memorial Hospital*, 726 F.2d 1543 (11th Cir.1984). Here, there is direct evidence of intentional sex discrimination. The Department had a clearly established policy of appointing only women as shift commanders at Tutwiler, and Edwards was specifically told that because of the policy he could not be promoted to such position. The court will therefore consider the evidence according to such cases as *Thompkins* and *Hayes*.

■ Where, as here, there is direct evidence that an employer has intentionally denied an employee a position because of the employee's sex, an employer may still prevail by establishing either of the following affirmative defenses: that the adverse personnel decision would have been reached even in the absence of the discriminatory motive, *Thompkins*, 752 F.2d at 563, or that a person's sex is a bona fide occupational qualification for the position sought. *Hayes*, 726 F.2d at 1547. The

---

**2.** Generally, there are two types of cases under Title VII, "disparate treatment" cases and "disparate impact" cases. In the former, the plaintiff must prove intentional discrimination. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). In the latter, the plaintiff challenges "practices that are fair in form, but discriminatory in operation," *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971); the plaintiff need not prove intentional discrimination. *International Brotherhood of Teamsters v. United States*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15. *See e.g., York v. Alabama State Board of Education*, 581 F.Supp. 779, 784–86 (M.D.Ala. 1983). The plaintiff must demonstrate that the practice or policy "has disproportionate impact on a group protected from discrimination under

Title VII. . . . An affirmative defense to a prima facie case of disparate impact is 'business necessity'. . . ." *Hayes v. Shelby Memorial Hospital*, 726 F.2d 1543, 1547 (11th Cir.1984).

**3.** To prove intentional discriminatory treatment by use of circumstantial evidence, the plaintiff must establish a prima facie case of discrimination. A prima facie case of discrimination raises the presumption that discriminatory intent motivated the adverse personnel action. The employer may rebut the presumption by articulating a legitimate, nondiscriminatory reason for the action, a reason that is clear and reasonably specific and worthy of credence. The plaintiff must then show that the proffered reason was a pretext for the true discriminatory reason. *Burdine, supra; McDonnell Douglas Corporation, supra.*

Department asserts both defenses, and the court now considers each in turn.[4]

### III.

■ The Department asserts that, even in the absence of its discriminatory policy, Edwards would not have been promoted to shift commander in the summer of 1983. That summer, the Department filled one of the shift commander positions through the process of selective certification from the "promotion" register, which ranks currently employed persons according to their ability and qualifications. Under this process, when a department seeks to fill an opening from within, the state personnel office certifies from the promotion register the names of the top three persons, from whom the Department chooses one—and if there are two positions available, the personnel office certifies four names; if three positions, five names; and so forth. The process is considered selective when the certification is restricted to persons having certain characteristics or belonging to certain groups. Here, the certification was selective because it was limited to women.

In the winter of 1983, the Department filled the other shift commander position with a woman from the personnel office's reemployment register. When using this register, the Department is not limited to the top candidates and may choose any person from the register. The Department has the prerogative whether to use the promotion or reemployment register. However, promotions are usually made by use of the promotion register.

The Department contends that, had it not used selective certification in the summer of 1983, Edwards would have ranked only fourth on the promotion register and thus would not have been among the top three certified for promotion by the state personnel office. This contention is meritless because it overlooks certain important facts. There were two, not one, shift commander positions available that summer. Without selective certification, the personnel office would have certified four names, including Edwards's, to fill the two positions. Furthermore, in light of Edwards's exemplary record and immediate experience as acting shift commander, this court is firmly convinced that, without the Department's discriminatory policy, he would have been selected to fill one of the positions. In the absence of the discriminatory policy, Edwards would therefore have been promoted to shift commander in the summer of 1983, with accompanying promotion to the rank of correctional officer supervisor I.

The Department has questioned whether it should bear the affirmative defense of establishing that, in the absence of its discriminatory policy, Edwards would not have been promoted. The Department contends that the issue of Edwards's position on the promotion register goes to his eligibility for the position and that Edwards should have the responsibility of establishing his eligibility as a part of his initial burden of proof. In the circumstances of this case, this contention is meritless.

■ At the time the Department denied Edwards the promotion, the sole reason stated and relied on by the Department was discriminatory. The evidence reflects that the issue of Edwards's position on the promotion register did not surface until after Edwards initiated legal proceedings challenging the Department's action. Thus, the evidence here reflects the following scenario: the employer admits acting for a discriminatory reason at the time of the adverse personnel action, but argues that had it not so acted for that reason the

---

**4.** Since the policy challenged here is facially discriminatory, the court agrees with the parties that this lawsuit should be treated as a disparate treatment rather than a disparate impact case. *See* note 2, *supra; Hayes,* 726 F.2d at 1548–52; *Hardin v. Stynchcomb,* 691 F.2d 1364 (11th Cir. 1982).

Nevertheless, the result would be the same if the court were to treat this case under the disparate impact theory. Edwards has shown disparate impact, and, for the reasons stated in part IV of this memorandum opinion, the Department has not shown business necessity, even though it is a "broader defense" than bona fide occupational qualification, *Hayes,* 726 F.2d at 1547. *See, e.g., Hardin,* 691 F.2d at 1372 n. 22.

employee would still not have been promoted. Under these circumstances, the employer should bear the burden of establishing what it would have done absent the admittedly discriminatory reason. *See Hardin*, 691 F.2d at 1369 n. 16.

The circumstances here are quite different from those where an employer maintains from the outset that the adverse personnel action was based on admittedly nondiscriminatory requirements and procedures. In such cases, it could be argued that the employee has the responsibility of establishing eligibility as a part of his burden of establishing direct evidence of discrimination; or it could be argued that such cases are best considered within the *Burdine* and *McDonnell Douglas* framework.[5] These are issues this court need not reach in this case.

Nevertheless, to ensure a full factual record and complete fairness to the Department, this court would add that if Edwards had the burden of establishing that he would have been selected and promoted from the promotion register, he has fully carried that burden.

### IV.

■ The Department asserts next that femaleness is a bona fide occupational qualification (bfoq) for shift commander at Tutwiler. The bfoq defense "is available only when the employer can show that the excluded class is unable to perform the duties that constitute the essence of the job, duties that Title VII defines as 'necessary to the normal operation of the particular business or enterprise.' 42 U.S.C.A. § 2000e–2(c)." *Hayes*, 726 F.2d at 1549. The court must therefore determine whether male employees like Edwards are unable to perform the duties essential to the normal operation of the job.

### A.

Courts have several times previously had to consider whether employment in prisons may be restricted by sex. In *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), the U.S. Supreme Court considered whether maleness was a bfoq for correctional officer positions in Alabama's prisons for male inmates. The Court said that "the bfoq exception was in fact meant to be an extremely narrow exception to the general prohibition of discrimination on the basis of sex." 433 U.S. at 334, 97 S.Ct. at 2729. In finding that the positions in question met this narrow exception, the Court took note of "peculiar" conditions in Alabama's prisons of "rampant violence" and a "jungle atmosphere." 433 U.S. at 334, 97 S.Ct. at 2729. Where inmates were not segregated according to their offenses or levels of dangerousness, the Court found that "[t]here is a basis in fact for expecting that sex offenders who have criminally assaulted women in the past would be moved to do so again if access to women were established within the prison." 433 U.S. at 335, 97 S.Ct. at 2730.

Courts since *Dothard* have said that this case dealt with "uniquely dangerous conditions." *Smith v. Fairman*, 678 F.2d 52, 54 (7th Cir.1982). In *Hardin v. Stynchcomb*, 691 F.2d 1364 (11th Cir.1982), the Eleventh Circuit considered whether maleness was a bfoq for the position of deputy sheriff in a county jail. The evidence reflected that most positions in the jail did not involve contact with inmates. Male deputies "booked" female inmates, but called on female deputies to search them. In emergencies, all deputies were expected to search all inmates. 691 F.2d at 1368.

The court in *Hardin* emphasized that "[s]ex based discrimination is valid only if

---

5. For example, in *Hayes* the appellate court faced a challenge to a hospital's admitted action of having discharged the plaintiff because she was pregnant. The court observed that
   > This might be a *Burdine* type case if, for example, the Hospital had dismissed Hayes claiming she was "inefficient," but Hayes had

asserted that the real reason for her dismissal was her pregnancy. The court would then be required to determine if the Hospital's stated reason for firing Hayes was a pretext for getting rid of a pregnant employee.
726 F.2d at 1548 n. 6. *See* note 3, *supra*.

the essence of the business would be undermined by not hiring members of one sex exclusively." 691 F.2d at 1370. "In addition, defendants bear the burden of proving that because of the nature of the operation of the business they could not rearrange job responsibilities in a way that would eliminate the clash between the privacy interests of the inmates and the employment opportunities of female deputy sheriffs." 691 F.2d at 1370–71. The court rejected the bfoq defense. 691 F.2d at 1372.

Recently, in *Garrett v. Okaloosa County*, 734 F.2d 621 (11th Cir.1984), the Eleventh Circuit again considered circumstances quite similar to those in *Hardin*. Female employees at a county jail sought positions as guards which the county restricted to male employees. 734 F.2d at 622–23. The county raised a bfoq defense and relied on a state regulation requiring a guard of an inmate's sex to be present when a guard of the opposite sex entered the area where the inmate was confined. 734 F.2d at 623–24. The court rejected the defense, stating that "the mere fact that a state enacts a discriminatory regulation does not create a BFOQ defense for one who follows such a regulation." 734 F.2d at 624. Furthermore, the evidence reflected that female employees in other county jails subject to the same regulation had served as guards despite the regulation. "For an occupational qualification to be 'bona fide,' it must be just as valid and necessary one day as it is the next." 734 F.2d at 624.

### B.

What stands out most about the Department's contention here that femaleness is a bfoq for the position of shift commander at Tutwiler is that Edwards held this position for nearly a year without any apparent difficulty. Though he held the position on an acting basis, he held it for a considerable period of time and performed all the duties that it required. Only when Edwards sought the position on a permanent basis was he transferred, and the Department did not justify his transfer with any alleged shortcomings on Edwards's part, but rather referred to its policy restricting shift commander positions to female employees. In light of this fact and others to be described, the Department has failed to prove that femaleness is a bfoq for the position of shift commander at Tutwiler.

The evidence is that shift commanders at Tutwiler work under the supervision of the warden, deputy warden and captain and are in charge of between eight and twelve correctional officers on a shift. Their principal duty is to supervise these officers who are stationed throughout the prison. This involves patroling the prison to monitor the officers and occasionally relieving them temporarily while they take breaks. The officers themselves patrol various areas of the prison including sleeping quarters and bathrooms. They inspect and sometimes physically search inmates on a regular basis and on occasions where circumstances such as suspicion of wrongdoing require. Shift commanders may also be called on to search inmates in these circumstances, as well as patrol sleeping quarters and bathrooms when relieving officers. Shift commanders also have administrative duties such as preparing officers' schedules.

The evidence is that Edwards efficiently and satisfactorily performed the duties of shift commander at Tutwiler while serving on an acting basis. The warden herself testified that Edwards's sex was not an obstacle to his fulfilling these duties. According to the evidence, Edwards rarely if ever had to search female inmates while serving as acting shift commander. Apparently, he was able to summon a female officer to perform this task. In fact, in his present position as supervisor of transfer agents, Edwards monitors the transportation of female inmates without assistance from other officers and thus is now more likely to have to search a female inmate than when he served as acting shift commander.

The evidence also shows that another male officer served as acting shift com-

mander at Tutwiler. He too did not have to perform searches of female inmates. Other male employees also work at Tutwiler as officers and usually are stationed in posts that do not require frequent contact with female inmates.

All Tutwiler employees agreed that in an emergency it would be appropriate for a male officer to search or subdue a female inmate. Nevertheless, the evidence is that such emergencies are quite rare. Conditions at Tutwiler are generally peaceful and orderly. There is no "rampant violence" or "jungle atmosphere." 433 U.S. at 334, 97 S.Ct. at 2729.

To support its bfoq defense, the Department relied on two of its regulations. Regulation 204, successor to the regulation considered in *Dothard*, prohibits employees from conducting "strip searches," "frisk or pat searches" or "patrol of toilet and shower areas, while in use" at prisons housing inmates of the opposite sex. Regulation 211 provides standards and procedures for filling vacant positions by selective certification, as previously described. According to the regulation, the position must meet certain criteria, including involving: frequent patrolling of dormitories, restrooms or showers; regular searches of inmates; contact with inmates without the presence of others; and the risk of disruption of the security and orderly running of the institution. Only then may the warden fill the position by selective certification.

The court need not and does not consider the general validity of Regulations 204 and 211 under Title VII. First, as already stated, the mere enactment and existence of a discriminatory regulation does not create a bfoq defense. *Garrett v. Okaloosa County*, 734 F.2d at 624. Thus, the mere existence of the regulations is beside the point.

Second, as in *Garrett*, the Department here has failed to show even that the regulations require denying Edwards promotion to shift commander. 734 F.2d at 624. Regarding Regulation 204's prohibition of officers' searching inmates of the opposite sex and their toilet and shower areas, the evidence reflects that shift commanders need not conduct such searches. Edwards and another male officer serving as acting shift commanders were able to perform their duties while calling on female officers for such searches. Thus, performing such searches does not "constitute the essence of the job" as a bona fide occupational qualification must. *Hayes*, 726 F.2d at 1549. The Department has failed to prove that the nature of the prison's operation precludes rearranging job responsibilities in a way that would eliminate the clash between the privacy interests of inmates and the employment opportunities of officers as shift commanders. *Hardin*, 691 F.2d at 1371. For these reasons as well, the Department has not shown that Regulation 211 calls for selective certification to fill the position of shift commander. According to the evidence, a shift commander can perform his or her duties without frequent patroling of dormitories, restrooms or showers or regular searches of or contact with inmates. Furthermore, the evidence is that Tutwiler is an orderly, peaceful institution despite the presence of officers of the opposite sex as the inmates.[6]

## V.

The remaining issue for the court is appropriate relief for Edwards. Victorious Title VII plaintiffs are presumptively entitled to backpay and reinstatement. *Nord v. United States Steel Corporation*, 758 F.2d 1462, 1472–73 (11th Cir.1985). The court will require that the Department pay Edwards backpay determined according to established legal principles. *See* 758 F.2d at 1469–71. The parties will be given an

---

**6.** The two regulations purport to serve the interests of inmates in privacy and of officers in safety. Under other circumstances, the court would have to consider whether or how the Department may or must meet these interests. *See, e.g., Bagley v. Watson*, 579 F.Supp. 1099, 1105 (D.Ore.1983) (male inmates' preference to have male officers perform searches rests on no constitutional right and does not establish *bona fide* occupational qualification). Here, however, the court need not do so, since the regulations themselves do not require what the Department claims, and their justification is thus irrelevant.

opportunity to attempt to agree on an appropriate amount of backpay.

■ However, where reinstatement of a victim of discrimination would necessarily displace an employee not implicated in illegal conduct, reinstatement may not immediately be appropriate. *See Parker v. Wallace*, 596 F.Supp. 739, 746 (M.D.Ala. 1984). Here, the evidence is that there are a limited number of shift commander positions at Tutwiler. If one of these positions is currently available, the Department must immediately fill it with Edwards. If a position is not currently available, the Department must fill the next available position with Edwards. In the meantime, Edwards should hold the rank of correctional officer supervisor I, and the Department must remunerate Edwards and award him other benefits as though he held the shift commander position.

Finally, the court will award Edwards a reasonable attorney fee pursuant to 42 U.S.C.A. §§ 2000e–5(k), determined according to the standards set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). *See also Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The parties will be given an opportunity to attempt to agree on a reasonable fee.

An appropriate judgment will be entered.