Raymond J. TORRES, Franklin J. Utz, and Gerald F. Schmit, Plaintiffs–Appellees,

v.

WISCONSIN DEPARTMENT OF HEALTH & SOCIAL SERVICES, et al., Defendants–Appellants.

No. 86–2161.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 9, 1986.

Decided Jan. 29, 1988.

Order on Rehearing April 21, 1988.

John R. Sweeney, Wisconsin Dept. of Justice, Madison, Wis., for defendants-appellants.

Dale L. English, Joseph H. Pomeroy, Colwin, Fortune Colwin Pomeroy & English, S.C., Fond du Lac, Wis., for plaintiffs-appellees.

Before CUDAHY and RIPPLE, Circuit Judges, and WILL, Senior District Judge.*

CUDAHY, Circuit Judge.

The plaintiffs in this suit are three men who are employed as correctional officers at a prison for women. They were demoted pursuant to the creation and implementation of a policy that designated certain correctional officer positions (including those formerly held by the plaintiffs) as open to women only. The plaintiffs sued, challenging this policy as violative of their right to be free from employment discrimination on the basis of sex, as guaranteed by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 (1982). The defendants responded that sex is a "bona fide occupational qualification" ("bfoq"), 42 U.S.C. § 2000e–2(e)(1), for the positions at issue because that distinction on the basis of sex is necessary to protect the privacy rights of the inmates and to promote the prison's purposes of security and rehabilitation. The district court found after a bench trial that the defendants had failed to establish that sex was a valid bfoq justi-

* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

fying the defendants' policy. 639 F.Supp. 271 (E.D.Wis.1986). We affirm.

## I.

### A.

In reviewing this case on appeal, we are mindful, as always, of the deference we owe to the trial court's findings of fact. Federal Rule of Civil Procedure 52(a) provides that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." The Supreme Court recently applied the rule to a Title VII claim in *Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). The Court stated there that " '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Id.* at 573, 105 S.Ct. at 1511 (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). A reviewing court may not reject a factual finding simply because it disagrees with the trier of fact. *Id.* Further, a reviewing court must show even greater deference to the trial court's findings that involve credibility of witnesses, "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* 470 U.S. at 575, 105 S.Ct. at 1512.

Deference to the district court's findings of fact is particularly appropriate in the present case. The district court heard numerous witnesses over the course of an eleven-day trial. Further, the district court conducted a tour of the women's prison involved here and thus was able to view the layout of the facilities and, to some degree, the extent to which the inmates were afforded privacy. 639 F.Supp. at 272. The

following summary of the facts is therefore based almost entirely on the district court's recitation of its factual findings, which we have found to be a careful and accurate reflection of the facts of record.[1]

### B.

The defendant Taycheedah Correctional Institution ("TCI") is the only women's maximum security prison in Wisconsin. TCI is operated by the Wisconsin Department of Health and Social Services ("DHSS"), which is also a defendant in this action. The final named defendant is Nona J. Switala who is the Superintendent of TCI, a position she has held since September 1978.

Prior to 1975, TCI was a prison for women. In 1975, DHSS designated TCI a co-correctional institution and transferred male inmates and male correctional officers to TCI. TCI again became a prison for women only in February 1978 and currently continues to be a women's prison. When the male inmates were transferred out of TCI, however, male correctional officers remained employed at TCI.

TCI includes three buildings in which inmates are regularly housed; each building has three residence floors. The inmates live in single, double and multiple occupancy rooms. Each room contains a bed for each inmate, a desk, chair, light, toilet and wash basin. In two of the three residence buildings, privacy curtains have been installed around the toilets. When an inmate is behind the curtain, only her feet are visible. Privacy curtains will soon be installed in the rooms in the remaining residence building.

The inmates' rooms have solid doors that contain, at eye level, a clear glass window that measures approximately four inches by six inches. During the hours of 6 a.m. to 9 p.m., the inmates are permitted to cover that window from the inside with a piece of cardboard known as a "privacy

---

1. The one possible exception to this is the district court's somewhat unclear description of the prison's policy on the use of privacy cards. *See infra* note 2. Our disposition of this case, however, is not affected by the district court's description of the privacy card policy. *See infra* pp. 950–53.

card" for a maximum of ten minutes while they are using the toilet or changing their clothing. During the hours 9 p.m. to 6 a.m., the privacy card is placed over the window on the outside of the door which enables the correctional officers to lift the card to see into the room in order, for example, to perform body counts. During these nighttime hours, the inmates apparently are not permitted to place the card over the window on the inside of the door for the ten-minute intervals.[2]

The correctional officers perform body counts each day at 7:30 a.m., 12:30 p.m., 5:30 p.m., 9:30 p.m., and once an hour between 10 p.m. and 6 a.m. The inmates are aware of this schedule. The officers perform the counts at night by looking in the windows in the doors to the inmates' rooms. The inmates are provided appropriate sleepwear from TCI but are not required to wear it.

Shower rooms are located on each floor of the residence halls. The doors to the shower rooms are solid; some contain windows, but the windows have been rendered opaque. Each shower room has one to three shower stalls, one to three toilet stalls, and some have one or more bathtubs. Each shower and toilet stall has a curtain or door which shields the inmate from view from the rest of the shower room. In all but the maximum security residence hall, only one inmate may occupy the shower room at a time, except that roommates may use the shower room together. Inmates are allowed fifteen minutes in the shower room.

Absent an emergency or rule violation, no correctional officer would see an inmate in any state of undress. In order to use the shower room, an inmate must sign up with the floor officers. The inmate must wear at least a robe or housecoat while traveling to and from the shower room. Correctional officers do not routinely enter the shower rooms while they are occupied.

Correctional officers at TCI perform three types of searches of inmates, all of which are authorized by the Wisconsin Administrative Code. Pat searches are the least intrusive and may be performed at any time, subject to certain restrictions and requirements. The inmate remains fully clothed during a pat search; she empties her pockets and then the searching officer runs his or her hands over the inmate's entire body. Although the Wisconsin Administrative Code provides that correctional officers may perform pat searches on inmates of the opposite sex, there is an unwritten rule at TCI that only female officers may perform pat searches. Strip searches, the second type of search used at TCI, must be authorized by a "lieutenant" and are performed in private, and, except in emergencies, only by officers of the same sex as the inmate. Body cavity searches, the most invasive of the searches, are performed only by medical personnel. Searches of the inmates' rooms are performed when the inmates are out of the rooms.

DHSS ranks its correctional officers as follows (in ascending order): correctional officer 1 ("CO–1"), correctional officer 2 ("CO–2") and correctional officer 3 ("CO–3"). TCI employs officers from all three classifications in its living units. The CO–3 in charge of a living unit is known as a "sergeant."

---

2. The district court's finding on this point is ambiguous. The court stated:

Since before 1975, inmates have been permitted to place small rectangular pieces of cardboard, termed "privacy cards" over the observation windows on the doors during nighttime hours. Since the cards were placed on the outside of the door, and were capable of being lifted sometimes, in 1976 inmates were given permission to cover the observation window with a privacy card on the inside of the room door for up to 10 minutes while dressing or using the toilet. Since 1983 the policy has been that from 9 p.m. to 6 a.m. inmates are permitted to have the privacy cards continuously over the window only on the outside of the door. They may still use the cards on the inside for the 10 minute maximum.

639 F.Supp. at 275. The parties, however, agree on appeal that the present policy at TCI prohibits placing privacy cards over the window on the inside of the door between the hours of 9 p.m. and 6 a.m. *See* Plaintiffs' Brief at 10; Defendants' Reply Brief at 3.

Prior to the implementation in 1980 of the plan that designated specified positions as available only to women, all correctional officer positions were open to all qualified officers without any restrictions based on sex. In August 1978, DHSS authorized correctional institution superintendents to submit requests for restricting certain correctional officer positions to women only where those positions involved performing strip searches or supervising the showers or living units. TCI's then-acting superintendent responded by proposing that five positions, including one CO-3 post, be limited to female officers. This plan was never formally adopted.

In June 1980, DHSS approved a different plan (the "Plan") which was based on a proposal by defendant TCI superintendent Switala. The Plan provided that nineteen of the twenty-seven correctional officer posts in the residence halls would be limited to women. This number included all of the CO-3 posts in the residence halls as well as all CO-1 and CO-2 "single coverage" posts, that is, posts where only one officer was assigned to a floor. Beginning on September 1, 1980, all vacancies for these posts were to be filled with female officers. If any of these posts were still held by men as of September 1, 1982, the male officers were to be replaced by female officers. With the full implementation of the Plan, fifteen of the eighteen CO-3 positions at TCI were restricted to women.

The three plaintiffs were all employed by TCI as CO-3's prior to the full implementation of the Plan. Pursuant to the Plan, the plaintiffs were removed from their CO-3 posts and involuntarily demoted to the rank of CO-2. They are presently working under female CO-3's who have less seniority and less experience than the plaintiffs.

The defendants do not dispute that the plaintiffs were qualified CO-3's and that they were performing their duties satisfactorily at the time of their demotion. Moreover, the Plan was not adopted for the purpose of addressing specific allegations of violations of the privacy of inmates by male officers. Rather, the plan was adopted because administrators at TCI were experiencing increased difficulty in assigning posts and shifts "that would recognize seniority, officer's personal desires, institutional requirements, and still have enough female CO's present at all shifts to insure what the institution felt was necessary for inmate privacy." 639 F.Supp. at 276.

None of the other six adult correctional institutions operated by the State of Wisconsin, including the Women's Correctional Center in Milwaukee, restricts any of its correctional officer positions to one sex. Female correctional officers employed at male prisons in Wisconsin testified at trial that they perform pat searches on male inmates, routinely inspect the showers and toilet areas and often see male inmates partially or completely undressed.[3]

---

3. As a preliminary manner, the defendants argue that two of the plaintiffs, Utz and Schmit, failed to file a timely complaint with the Equal Employment Opportunity Commission. The defendants contend that the plaintiffs were notified of the existence of the Plan in 1980, but did not file charges until after their demotions, pursuant to the full implementation of the Plan, in September 1982. We agree with the district court that the relevant discriminatory act was the Plan's implementation and the plaintiffs' resulting demotions in 1982. The plaintiffs' status at TCI was not directly affected by the mere adoption of the Plan in 1980, nor were their future demotions assured at that time. *But, cf. Lorance v. AT & T Technologies, Inc.*, 827 F.2d 163, 167 (7th Cir.1987) (statute of limitations triggered by employee's subjection to discriminatory scheme in "narrow" set of cases involving "facially-neutral but discriminatory seniority system[s]").

We also agree with the district court's characterization of the Plan as a continuing violation. This circuit has described a continuing violation as one "in which the employer's express, openly espoused policy [is] alleged to be discriminatory" and "was applicable to the plaintiff at the time the discrimination charge was filed." *Stewart v. CPC Int'l, Inc.*, 679 F.2d 117, 121 (7th Cir.1982) (discussing *Bartmess v. Drewrys U.S.A., Inc.*, 444 F.2d 1186 (7th Cir.), *cert. denied*, 404 U.S. 939, 92 S.Ct. 274, 30 L.Ed.2d 252 (1971)). This case does not involve merely a one-time act of demoting Utz and Schmit. Rather, TCI's openly discriminatory policy remained in effect subsequent to the demotions and continued to exclude all male correctional officers, including the plaintiffs, from the positions covered by the Plan. For these reasons, we find that the suits filed by Utz and Schmit were not time barred.

## II.

In defense of the Plan's overt discrimination on the basis of sex, the defendants claim that sex is a "bona fide occupational qualification," as that term is used in section 703(e) of Title VII, for the positions identified in the Plan. Section 703(e) of Title VII authorizes sex-based discrimination "in those certain instances where ... sex ... is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e–2(e)(1). The Supreme Court has stated that the bfoq exception is "an extremely narrow exception to the general prohibition of discrimination on the basis of sex." *Dothard v. Rawlinson*, 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977). In support of this "extremely narrow" standard, the Court cited the legislative history of Title VII, the consistent interpretation of the provision by the Equal Employment Opportunity Commission, and the restrictive language of section 703(e) itself. *Id.*

█ The Court also quoted approvingly from two cases from the Fifth Circuit that formulated very demanding tests for a valid bfoq defense. In *Diaz v. Pan American World Airways*, 442 F.2d 385, 388 (5th Cir.), *cert. denied*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971), the court held that "discrimination based on sex is valid only when the *essence* of the business operation would be undermined by not hiring members of one sex exclusively." *Quoted in Dothard*, 433 U.S. at 333, 97 S.Ct. at

2729 (emphasis in original). The same court held in an earlier opinion that an employer could present a successful bfoq defense only by proving "that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved." *Weeks v. Southern Bell Tel. & Tel. Co.*, 408 F.2d 228, 235 (5th Cir.1969), *quoted in Dothard*, 433 U.S. at 333, 97 S.Ct. at 2729. Thus, a defendant bears a heavy burden in attempting to establish a bfoq defense. He or she clearly may not justify a refusal to hire members of one sex merely by pointing to stereotypes about differences between women and men. *Dothard*, 433 U.S. at 333, 97 S.Ct. at 2728.[4]

### A.

█ The state defendants argue that the essence of TCI's business does require that only women be hired for the positions in question. This sex-based discrimination is necessary, according to the defendant, to preserve prison security, protect the privacy interests of the inmates and promote rehabilitation of the inmates. In support of its argument that prison security may provide the basis for a bfoq defense, the defendants cite the Supreme Court's opinion in *Dothard*, 433 U.S. 321, 97 S.Ct. 2720. The Court in *Dothard* upheld a regulation that explicitly excluded women from certain jobs in Alabama's penitentiaries for

**4.** The defendants argue that this court should defer to the prison administrators' determination that the Plan was necessary. Although we show deference to the expertise of prison authorities in the management of prisons in some contexts, *see, e.g., Rhodes v. Chapman*, 452 U.S. 337, 351 n. 16, 101 S.Ct. 2392, 2401 n. 16, 69 L.Ed.2d 59 (1981), where the issue is employment discrimination, the claims of prison authorities about the needs of the institution must satisfy the same burdens of proof as are imposed on any employer attempting to meet the "extremely narrow" bfoq exception to Title VII. *Dothard* itself, in which the Supreme Court set forth general standards to be applied when evaluating a bfoq defense, involved a challenge to a state regulation that excluded women from employment in some state prison positions. Yet the Court did not include as part of its analysis

a showing of deference to the prison authorities' determinations concerning the exclusion of women from the positions at issue. In fact, in considering a related claim, the Court rejected the state defendants' argument that because a challenged policy was enacted by statute, the policy was entitled to greater deference than policies implemented by private employers. The Court noted that "Congress expressly indicated the intent that the same Title VII principles be applied to governmental and private employers alike." *Dothard*, 433 U.S. at 332, 97 S.Ct. at 2728. Further, other federal courts that have reviewed sex-based restrictions on prison employment have not shown deference to determinations made by prison authorities about the need for those restrictions. *See* cases cited *infra* p. 953.

men, finding that "[t]he employee's very womanhood would ... directly undermine her capacity to provide the security that is the essence of a correctional counselor's responsibility." *Id.* at 336, 97 S.Ct. at 2730. Yet the Court based that finding on the fact that Alabama's penitentiaries were "not typical," *id.* at 336 n. 23, 97 S.Ct. at 2730 n. 23, and were "peculiarly inhospitable ... for human beings of whatever sex," *id.* at 334, 97 S.Ct. at 2729. A federal district court had found conditions in Alabama's prisons to be "constitutionally intolerable" and characterized by "rampant violence" and a "jungle atmosphere." *Id.* A substantial percentage of the inmates were sex offenders who were scattered throughout the prison population. The Court believed that, given these extreme circumstances, there was a real risk that male inmates would physically assault female correctional officers, which would jeopardize the security of the entire prison. *Id.* at 335–36, 97 S.Ct. at 2729–30.

The defendants' prison security justification for the Plan bears no resemblance to that accepted in *Dothard.* They do not argue that the conditions in TCI are particularly violent and that female inmates convicted of sex offenses were likely to assault male correctional officers, as a result of their "very manhood." Rather, their security rationale is actually inextricably connected with their privacy rationale. According to the defendants, if they were to employ male correctional officers for the positions at issue and continue to operate TCI in a manner necessary to preserve prison security, they inevitably would seriously interfere with the privacy interests of the inmates. Because the defendants have no distinct security justification for the claimed bfoq, we will consider their discussion of the needs of prison security in the context of our evaluation of their privacy argument.

### B.

■ When presented with a claim, such as the present one, that the right of members of one sex to equal employment conflicts with the privacy interests of members of the opposite sex, a court faces difficult questions, the resolution of which may require sacrificing one of these important interests. The court must consider at what point the threat of an infringement of privacy interests meets the requirements of a bfoq defense and thus justifies excluding members of one sex from an employment opportunity. This question involves several further inquiries. How likely must the privacy infringement be? How severe must the potential intrusion be? Must it rise to the level of a constitutional violation? Is it significant that preferences for privacy from members of the opposite sex may be entirely culturally created, and that by recognizing such preferences the courts may encourage sex differences at the expense of equality in employment? On the other side of the scale, how severely will the alleged bfoq compromise the right to equal employment?

Courts confronted with these issues have reached conclusions that have varied from one extreme to the other. A federal district court in Arkansas held that a hospital could exclude male nurses from the labor and delivery section of its obstetrics and gynecology department in order to protect the privacy rights of its patients. *Backus v. Baptist Medical Center,* 510 F.Supp. 1191 (E.D.Ark.1981), *vacated as moot,* 671 F.2d 1100 (8th Cir.1982). According to the court, sex was a valid bfoq because the hospital would violate the patients' constitutional rights to privacy if it allowed male nurses to fill these positions. Expressing a similar view, a district court in Michigan held that state mental health care institutions could rely on the privacy rights of their patients to justify a sex bfoq for positions involving patient care, stating:

> Obviously most people would find it a greater intrusion of their dignity and privacy to have their naked bodies viewed (or any number of personal services performed) by a member of the opposite sex. Although there will be a certain relinquishment of privacy by necessity when anyone is admitted to a hospital or mental health facility, this is not to say that a patient has forfeited all rights to privacy.

*Local 567 Amer. Fed'n of State, County & Mun. Employees v. Michigan Council 25, Amer. Fed'n of State, County & Mun. Employees,* 635 F.Supp. 1010, 1013–14 (E.D.Mich.1986) (footnote omitted).

A district court in Oregon took a very different view. The court held that the state could not exclude female correctional officers from positions that involved both performing "pat-down" frisk searches of clothed male inmates (including their anal-genital areas) and visual observations of male inmates in various states of undress. *Bagley v. Watson,* 579 F.Supp. 1099 (D.Or. 1983). The court relied on the reasoning expressed by Justice Marshall in the following quote from his dissent in *Dothard,* 433 U.S. at 346 n. 5, 97 S.Ct. at 2735 n. 5:

> [I]f women guards behave in a professional manner at all times, they will engender reciprocal respect from inmates, who will recognize that their privacy is being invaded no more than if a woman doctor examines them. The suggestion implicit in the privacy argument that such behavior is unlikely on either side is an insult to the professionalism of guards and the dignity of inmates.

*Quoted in Bagley,* 579 F.Supp. at 1104; *see also Griffin v. Michigan Dep't of Corrections,* 654 F.Supp. 690, 702–03 (E.D. Mich.1982).

The present case is further complicated by the fact that those asserting infringements of their privacy are prisoners. The Supreme Court has repeatedly held that prison inmates retain certain constitutional rights after their conviction and incarceration. *See, e.g., Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979) (citing cases). Yet the Court has also held that these rights are not absolute, but are subject to restrictions and limitations imposed to further legitimate institutional goals and policies. *Id.* at 545–48, 99 S.Ct. at 1877–79. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948), *quoted in Bell,* 441 U.S. at 545–46, 99 S.Ct. at 1877–78.

Thus, in *Bell,* the Court held that requiring inmates to submit to visual body cavity searches after every contact visit with a person from outside the institution did not violate the fourth amendment. This circuit has held that "[o]ne of the most important rights which is necessarily limited as a result of one's incarceration is the right to be free of unwarranted intrusions into one's personal privacy." *Smith v. Fairman,* 678 F.2d 52, 54 (7th Cir.1982) (male inmates' constitutional right to privacy not violated by performance of frisk searches, excluding genital area, by female correctional officers), *cert. denied,* 461 U.S. 907, 103 S.Ct. 1879, 76 L.Ed.2d 810 (1983). Nevertheless, inmates do retain some constitutional right to privacy. The First Circuit has recently held that "a body-cavity search of female inmates conducted by police officers, involving touching, conducted in a non-hygienic manner and in the presence of male officers, was a clearly established violation of the inmates' fourth amendment right to be free from an unreasonable search." *Bonitz v. Fair,* 804 F.2d 164, 173 (1st Cir.1986) (footnote omitted).

The plaintiffs respond to the state's privacy concerns by arguing that the inmates at TCI have no constitutional right of privacy that can justify the Plan. Implicit in this argument is the view that a bfoq cannot be upheld in this case absent a violation of the inmates' constitutional right to privacy. We recognize that some courts in analogous cases have looked to whether the privacy infringement rose to the level of a constitutional violation. *See, e.g., Backus,* 510 F.Supp. 1191. We need not, however, define here precisely at what point the privacy interests of inmates would justify a sex bfoq for correctional officers. The present case is not a close one that would require us to resolve the difficult questions discussed above. TCI is currently operated in a way that is very sensitive to the privacy interests of its inmates and affords them a good deal of privacy from correctional officers of both sexes. The defendants have not met their burden of proving the existence of a serious conflict between the privacy interests of the in-

mates and the employment rights of the correctional officers, nor have they shown that any conflict that does exist cannot be remedied through means short of a restriction based on sex.

The Second, Eighth and Eleventh Circuits, as well as several federal district courts, have considered attempts by states to restrict correctional officer and similar positions in prisons to the same sex as that of the inmates; in each of these cases, the court held that the privacy interests of the inmates did not justify a sex bfoq for the position(s) involved. *See Hardin v. Stynchcomb,* 691 F.2d 1364 (11th Cir.1982); *Forts v. Ward,* 621 F.2d 1210 (2d Cir.1980); *Gunther v. Iowa State Men's Reformatory,* 612 F.2d 1079 (8th Cir.), *cert. denied,* 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980); *Edwards v. Department of Corrections,* 615 F.Supp. 804 (M.D.Ala.1985); *Bagley v. Watson,* 579 F.Supp. 1099 (D.Or. 1983); *Griffin v. Michigan Dep't of Corrections,* 654 F.Supp. 690 (E.D.Mich.1982); *Harden v. Dayton Human Rehabilitation Center,* 520 F.Supp. 769 (S.D.Ohio 1981), *aff'd,* 779 F.2d 50 (6th Cir.1985).[5] In addition to the requirements described in *Dothard,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786, *Diaz,* 442 F.2d 385, and *Weeks,* 408 F.2d 228, *see supra* p. 949, defendants in such suits "bear the burden of proving that because of the nature of the operation of the business they could not rearrange job responsibilities in a way that would eliminate the clash between the privacy interests of the inmates and the employment opportunities of female deputy sheriffs [or correctional officers]." *Hardin,* 691 F.2d at 1370-71; *see Gunther,* 612 F.2d at 1086; *Edwards,* 615 F.Supp. at 808-09; *Griffin,* 654 F.Supp. 704-05; *Harden,* 520 F.Supp. at 779; *see also Norwood v. Dale Maintenance Sys., Inc.,* 590 F.Supp. 1410, 1415 (N.D.Ill.1984) ("When privacy considerations of clients or guests serve as a reason for hiring only members of one sex, however, the defendant must also prove that no reasonable alternatives exist to its gender-based hiring policy."). "Resolution of such cases requires a careful inquiry as to whether the competing interests can be satisfactorily accommodated before deciding whether one interest must be vindicated to the detriment of the other." *Forts,* 621 F.2d at 1212.

A review of these analogous cases reveals that a prison can usually preserve the privacy interests of its inmates without sacrificing the right of correctional officers to equal employment opportunities; thus, a bfoq is rarely justified.[6] The rationale for the claimed bfoq's that was most frequently offered in these cases was that the duties of the correctional officer positions at issue included performing strip searches and observing inmates while they were using the showers and toilets. These courts

---

5. Although this Title VII suit was brought by male correctional officers, we note that sex-based discrimination in prison employment generally operates to exclude women from prison employment opportunities. *See, e.g., Dothard,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786; *Hardin,* 691 F.2d 1364; *Forts,* 621 F.2d 1210; *Gunther,* 612 F.2d 1079; *Bagley,* 579 F.Supp. 1099; *Griffin,* 654 F.Supp. 690; *Harden,* 520 F.Supp. 769.

6. The defendants cite several cases that have held that a bfoq was justified by privacy concerns in the prison context. *See Hudson v. Goodlander,* 494 F.Supp. 890 (D.Md.1980); *Reynolds v. Wise,* 375 F.Supp. 145 (N.D.Tex. 1973); *In re Long,* 127 Cal.Rptr. 732, 55 Cal.App. 3d 788, *hearing granted, dismissed as moot,* 55 Cal.App.3d 798 (1976). These cases, however, did not recognize that the defendants in such a suit bear the burden of proving that alternatives with a less discriminatory effect were unavailable. Because we find that these courts did not apply the appropriate standard for the "extremely narrow" bfoq exception, we decline to follow these cases to the extent that they are inconsistent with this opinion.

Even if we found the legal analysis in these cases to be persuasive, at least two of these three cases are factually distinguishable from the present one and therefore do not affect our disposition here. In *Hudson,* the court found the inmates' rights were violated "by the assignment of female guards to posts where they could view [them] while [they were] completely or entirely unclothed." 494 F.Supp. at 893. The court in *In re Long* found that the male inmates were forced to "undress, bathe, void [and] excrete" in the presence of female guards. 127 Cal.Rptr. at 737. In the present case, no correctional officers of either sex regularly view the inmates while they are undressed or using the shower or toilets.

rejected this justification as inadequate and found that the prisons had not met their burden of proving that alternatives with less discriminatory impact were unavailable. For example, a prison could reassign duties involving strip searches and shower and toilet surveillance so that, other than in emergencies, these duties would be performed by officers of the same sex as the inmates. *See Hardin*, 691 F.2d at 1373; *Forts*, 621 F.2d at 1216; *Gunther*, 612 F.2d at 1087; *Edwards*, 615 F.Supp. at 809–10; *Harden*, 520 F.Supp. at 779–80. In addition, a prison could install shower curtains that permit only enough visibility to allow the correctional officer to ascertain that the shower was occupied. *See Forts*, 621 F.2d at 1216. Absent countervailing security problems, a prison could afford inmates privacy when dressing or using a toilet in their cells by permitting them to cover the window on their cell doors while engaging in these activities. *See id.* Finally, a prison could provide inmates with suitable sleepwear to avoid inadvertent exposure of their bodies while sleeping. *See id.* at 1217.

Significantly, most of the alternatives to bfoq's suggested by other courts have already been implemented at TCI. Strip searches may be performed only by correctional officers of the same sex as the inmate, except in an emergency. The doors to the shower rooms are solid, and each shower and toilet stall within the shower rooms has its own door or curtain. Correctional officers do not routinely enter a shower room while it is occupied by an inmate. Inmates must be clothed when walking between their rooms and the shower room.

The toilets in the inmates' rooms in two of the three residence halls at TCI have privacy curtains, and TCI plans to install curtains around the toilets in the third residence hall. The inmates are permitted to cover the windows in the doors to their rooms with "privacy cards" for up to ten minutes between the hours of 6 a.m. and 9 p.m. while they are dressing or using the toilet. TCI provides the inmates with suitable sleepwear.

In addition, for at least four years prior to the full implementation of the Plan, male correctional officers had successfully held the CO–3 positions now limited to women by the Plan. *See Edwards*, 615 F.Supp. at 809 ("What stands out most about the Department's contention here that femaleness is a bfoq for the position of shift commander at [Alabama's prison for women] is that Edwards [the male plaintiff] held this position for nearly a year without any apparent difficulty."). The defendants have offered no evidence that the privacy interests of TCI's inmates were in any way compromised during that time. *See Harden*, 520 F.Supp. at 779 ("[T]he Court is unconvinced that *speculation* about potential privacy violations creates a basis in fact for the issuance of an occupational qualification such as the one herein.") (emphasis in original).

The district court found that, given the procedures followed within the housing units at TCI, "correctional officers, both male and female, would never see an unclothed inmate except during an emergency or where the inmate voluntarily displays her unclothed self or fails to avail herself of the procedures designed to protect her privacy." 639 F.Supp. at 281. The court therefore concluded that "the system in place at TCI sufficiently protects the inmates' privacy rights without the need for a BFOQ plan." *Id.* The only possible exception to this finding by the district court is that an inmate in the residence hall which does not yet contain privacy curtains might have no private space during the hours of 9 p.m. to 6 a.m. if, in fact, TCI does not permit the use of privacy cards during those hours. The defendants, however, have not met their burden of proving that this possibility justifies the Plan. Obvious alternatives to a bfoq exist, namely, installing privacy curtains in the third residence hall (which the defendants have agreed to do) or allowing inmates to use the privacy cards during the night as they do during the day (which the defendants have not proven to be an unacceptable alternative). *See Forts*, 621 F.2d at 1216.

### C.

■ The defendants' third and final rationale for the Plan is that restricting the CO–3 positions in the living units to women furthers the rehabilitation needs of the inmates. They argue that "normalization" of the prison environment is desirable and necessary for rehabilitation to take place and that "such normalization cannot be rationally furthered by subjecting inmates in the showers or toilets to scrutiny by the opposite gender officers." Defendants' Brief at 18. The defendants also claim that among female inmates there has been a history of a "high incidence of physical, sexual, and psychological abuse and domination by men." This pattern of male domination, according to the defendants, would be reinforced by allowing male correctional officers to work in the living units, which in turn would be "destructive to a female inmate's development of an independent self-image." *Id.* at 20–21.

The defendants have not proven the asserted factual bases for their rehabilitation rationale. The district court found, and we have found no basis in the record for disagreeing, that correctional officers at TCI do not and need not view inmates in the showers or toilets or in any state of undress, absent an emergency. Further, the defendants have not shown that female inmates assigned to TCI have experienced more severe abuse and domination by men than have women in our society as a whole. The defendants' own expert witness, psychologist Dr. Henry Musk, testified that "the rate of abuse, physical or sexual of women in the general population apparently is about the same of women in prison." Trial transcript, Volume 10, at 76 (Aug. 6, 1985).

Defendants did represent that many female inmates have been unusually scarred by male abuse and that the peculiar power relationship between male guards and female prisoners makes male guards an obstacle to rehabilitation. *E.g.,* Trial transcript, Volume 10, at 33–37 (Aug. 6, 1985) (testimony of Joanne M. Brown). If demonstrated, this proposition might justify excluding males from the staff even if female inmates have not suffered unusually severe male abuse. The district court, however, found:

> Defendants offered only a *theory* of rehabilitation as a justification for the BFOQ Plan. They offered no objective evidence, either from empirical studies or otherwise, displaying the validity of their theory. Indeed, Superintendent Switala testified that there had been no change in the recidivism rate at TCI from 1980 to the present. The Court refuses to find the Plan valid based strictly on the unproven rehabilitation theory presented by defendants at trial.

639 F.Supp. at 280 (emphasis in original). The court also noted that the plaintiffs had presented expert testimony that directly contradicted the defendants' theory; the plaintiffs' experts testified that the presence of male correctional officers in the living units would contribute to the normalization of the prison environment and therefore have a beneficial effect on inmate rehabilitation. *E.g.,* Trial transcript, Volume 6, at 14–15 (July 30, 1985) (testimony of Dr. Frederick Forsdal). We agree with the district court that the defendants have not met their heavy burden of proving that their rehabilitation theory satisfied the requirements of the very narrow bfoq exception to Title VII.

### III.

In upholding the district court's judgment for the plaintiffs in this Title VII claim, we are not holding that a state could never establish a valid sex bfoq for a correctional officer position in a women's prison. Specifically, we do not hold that the state would have to dispel all reasonable doubts about its theory of female inmate rehabilitation before it could exclude male correctional officers. It is even conceivable that the rehabilitation theories and privacy concerns asserted by the defendants in the present case could be shown to justify the Plan instituted by the state.[7] The defend-

7. The dissent argues with some force that the state should be allowed to experiment in its efforts to achieve greater rehabilitation. An experiment that infringes on workers' Title VII

ants, however, did not prove this to the satisfaction of Judge Warren. Because his findings are supported by the evidence and are not clearly erroneous, the district court's judgment is

AFFIRMED.

RIPPLE, Circuit Judge, dissenting.

The majority emphasizes the characterization of this case that permits it to affirm the district court most easily. When viewed solely as a conflict between the plaintiffs' rights under Title VII and the inmates' constitutional right to privacy, affirming the district court becomes a relatively straightforward matter. An inmate's constitutional rights to privacy are necessarily limited and an employee's rights under Title VII are statutorily broad.

There is, however, another consideration, deemphasized by the majority, that makes this case far more difficult and, in my view, renders erroneous the majority's disposition. This case is much more than a conflict between the rights of inmates and those of their guards. It also presents a serious conflict between the employees' important rights under Title VII and the important right of a prison administrator to seek new solutions to a grave problem that, up to now, has defied solution.

A key issue at trial was the defendants' contention that male guards in a female prison unavoidably hamper the state's efforts at rehabilitating the inmates.[1] The record indicates that at least 60 percent of the prisoners at TCI had been physically and sexually abused in their lives by males. For that reason, an experienced and well-educated prison superintendent made a calculated and reasoned decision that using female guards might help the prisoners overcome the negative self-image that re-

sulted from such abuse. Regardless of the precautions taken to prevent the male guards from invading the women inmates' privacy, the administrator believed that rehabilitation efforts were thwarted by the male guards' mere presence. At trial, she testified:

A good many—about 60 percent of our population comes from abusive backgrounds, either ... at the hands of their parents or spouse or boyfriend or whatever[.] [T]hey come into the institution and they have told me of their fear of assault, their fear of physical harm from inmates, and I believe that if a woman is afraid, that is going to take over predominantly her energy. The energy she has to invest in herself is going to be diminished by those concerns [and] by [not] being able to assure her that in her living space, men will not be intruding on her private life.

. . . .

[W]omen, as a rule, when they come in, they have a history of being very influenced, if not dominated by men in their lives and one of our major goals is to teach them ... self-respect and ... dignity[,] [and that they] have the capability of making their own decisions and living their lives based on their own perceptions of what they want and what their options are. And [if] we establish atmospheres where men are playing the primary dominant force, which is somewhat natural in a prison anyway, in terms of staffing, or power or authority over inmates, we were to perpetuate that, that's just going to further compound what she's lived with in the past and she will probably defer to the male and that's not something we want her to do.

protections against discrimination based on gender, however, should not be permitted to go forward without some preliminary showing that it is likely to achieve objectives beyond the testing of a theory.

**1.** The majority cites only one case dealing with a female penitentiary. *Forts v. Ward,* 621 F.2d 1210 (2d Cir.1980). *Forts,* however, is vastly different from this case. It involved a suit by

prisoners against the prison administrators; the prisoners sought to enjoin the prison from assigning male guards to duties in the housing and hospital units of the prison. Thus, *Forts* involves the straight-forward conflict between the prisoners' rights to privacy and the guards' rights under Title VII. Rehabilitation was not an issue, and indeed, the prison administrators saw no need to remove the male guards.

Tr. IX at 39, 43–44. The district court dismissed this purpose because the defendants failed to show "objective evidence, either from empirical studies or otherwise, displaying the validity of their theory," 639 F.Supp. at 280. The majority agrees. It thus concludes that the defendants did not meet their "heavy burden" under the "very narrow bfoq exception to Title VII."

I have no difficulty accepting the majority's formulation of the standard for finding a bfoq. The standard is indeed "extremely narrow," *Dothard v. Rawlinson*, 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977), requiring proof of "business necessity." *Id.* at 332 n. 15, 97 S.Ct. at 2728 n. 15. However, by requiring objective evidence and empirical studies, the majority has placed on these defendants an unreasonable burden. The Supreme Court has repeatedly recognized the complexity of the problems facing those responsible for managing our penal system. *See, e.g., Rhodes v. Chapman*, 452 U.S. 337, 352, 101 S.Ct. 2372, 2402, 69 L.Ed.2d 59 (1981); *Bell v. Wolfish*, 441 U.S. 520, 547–48, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 127–29, 97 S.Ct. 2532, 2538–40, 53 L.Ed.2d 629 (1977); *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). In *Procunier*, the Court said:

> Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. *The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable,* and, more to the point, they are not readily susceptible of resolution by decree.... Judicial recognition of that fact reflects no more than a healthy sense of realism.

*Id.* at 404–05, 94 S.Ct. at 1807 (emphasis added). The difficulties of prison administration identified by the Supreme Court are even more perplexing in the context of this case because it involves a female penitentiary. The problems of female penitentiaries are unique, and society is only now awakening to their special circumstances. Between 1940 and 1970, the number of female prisoners in federal and state penitentiaries was relatively constant at about 6,000 inmates. U.S. Department of Justice, Bureau of Justice Statistics, *Sourcebook of Criminal Justice Statistics* 399 (1986). But from 1970 to 1985 the number of female prisoners more than quadrupled, going from 5,635 inmates to 23,091 inmates. U.S. Department of Commerce, Bureau of the Census, *Statistical Abstract of the United States* 188 (1977); U.S. Department of Commerce, Bureau of the Census, *Statistical Abstract of the United States* 174 (1987). Between 1980 and 1985 alone, the number of female inmates increased from 13,420 to 23,091. *Id.* These increases no doubt have significantly affected conditions in female penitentiaries. Not only do we not know the answers to the problems of a female prison, but we do not even know all the questions. Requiring the superintendent of a female prison working under these conditions to provide objective proof that male guards retard the inmates' rehabilitation is asking the impossible; research into the problems of female prisons is simply too immature to expect so much.

The majority concludes that a footnote in *Dothard v. Rawlinson*, 433 U.S. at 331–32 n. 15, 97 S.Ct. at 2728 n. 15, means that the degree of scrutiny applied in this case can be no different than the scrutiny applied in a more routine bfoq case. There, the defendants had argued that the court should apply a deferential standard of review to height and weight requirements for prison guards because the requirements had been imposed by state statute. In the *Dothard* footnote, the Court dismissed this argument, noting that "Congress expressly indicated the intent that the same Title VII principles be applied to governmental and private employers alike." *Id.* I have no disagreement with the majority's interpretation of *Dothard.* Private enterprise and public enterprise should be treated the same under Title VII. But this does not prohibit us from recognizing that the unique nature of an enterprise, public or private, may justify gender-based distinctions that would not be permissible in other contexts. *See Dothard*, 433 U.S. at 334, 97 S.Ct. at 2729 (holding that the unique atmosphere of the Alabama state prisons justified a prohibition on female guards that might not have been justified elsewhere). Thus, there is no reason for the majority to overlook the vast body of Supreme Court precedent emphasizing that prisons present unique management situations. We should recognize that the job of the prison admin-

istrator is to find a solution to a problem that others before have not found. Of *necessity*, the prison administrator is *required to experiment and innovate.* To forbid a prison administrator from seeking new solutions to a riddle that has baffled society for so long is to prevent the administrator from doing what is necessary to fulfill the very "essence" of her "business." *Diaz v. Pan American World Airways*, 442 F.2d 385, 388 (5th Cir.), *cert. denied*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971). So viewed, the defendants in this case have met their burden for establishing a bfoq. They have established a "business necessity" for the practice, *Dothard*, 433 U.S. at 332 n. 15, 97 S.Ct. at 2728 n. 15; they have to try new approaches.

Today, the majority sends a message that gender-based solutions to prison dilemmas are out-of-bounds, no matter how reasonable the proposal, unless the proposal is supported by objective, empirical evidence. This is indeed a Catch–22. How will any administrator of a female prison obtain any empirical data unless a court will permit a sustained, serious test?

I cannot imagine many cases in which the often-quoted dissent of Justice Brandeis in *New State Ice Co. v. Liebmann*, 285 U.S. 262, 310–11, 52 S.Ct. 371, 386, 76 L.Ed. 747 (1932), would be more appropriate. Pointing out that the "economic and social sciences are largely uncharted seas," he said:

> The discoveries in physical science, the triumphs in invention, attest the value of the process of trial and error. In large measure, these advances have been due to experimentation. In those fields experimentation has, for two centuries, been not only free but encouraged. Some people assert that our present plight is due, in part, to the limitations set by courts upon experimentation in the fields of social and economic science; and to the discouragement to which proposals for betterment there have been subjected otherwise. There must be power in the States and the Nation to remould, through experimentation, our economic practices and institutions to meet changing social and economic needs....
> To stay experimentation in things social and economic is a grave responsibility.

> Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.

*Id.* at 310–11, 52 S.Ct. at 386.

As a general proposition, we ought not permit employers to elude Title VII's requirements by arguing that they were "experimenting." Rare is the employment situation in which an employer could argue that gender-based distinctions are a "reasonably necessary" approach to innovation. But this case involves a female penitentiary, an institution facing new and unique problems that necessarily require it to navigate "uncharted seas." It is hardly beyond the scope of reasonable experimentation for a prison administrator to conclude that there is a good chance that female prisoners, the majority of whom have been abused by males, might make better progress toward rehabilitation if they did not have to check in, clad only in a bath robe, with a male guard before taking a shower. It is hardly an unreasonable experiment to suggest that these women might adjust more rapidly if they did not have to sleep with the knowledge that male guards could peer into their sleeping rooms at will.

There is perhaps no more isolated minority in the United States today than female prisoners. In this case, Wisconsin has attempted to help these women become integrated with, and enjoy the full benefits of, society. The objective of Title VII is similar. Yet, the majority holds that this very statute effectively forbids Wisconsin from making such an effort. This is indeed a strange fulfillment of the Congressional intent.

Before BAUER, Chief Judge, CUMMINGS, WOOD, CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION and KANNE, Circuit Judges.[*]

### ORDER

PER CURIAM.

On consideration of the petition for rehearing and suggestion for rehearing *en*

---

[*] The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, who was on the original panel, did not participate in consideration of the petition for rehearing *en banc.*

*banc* filed by counsel for defendants-appellants in the above-entitled cause, a vote of the active members of the Court was requested. A majority of the judges in regular active service voted to GRANT a rehearing. Accordingly,

IT IS ORDERED that the aforesaid petition for rehearing and suggestion for rehearing *en banc* be, and the same is hereby, GRANTED.

IT IS FURTHER ORDERED that the judgment and opinion entered in this case on January 29, 1988 be, and are hereby, VACATED. This case will be reheard *en banc* at the convenience of the Court.